# IN THE COURT OF APPEALS OF IOWA

No. 25-1351
Filed May 13, 2026

**Auston David Herman,**
Plaintiff–Appellee,

v.

**Holly Noel Morrison,**
Defendant–Appellant.

Appeal from the Iowa District Court for Keokuk County,
The Honorable Crystal S. Cronk, Judge.

**AFFIRMED**

Diana L. Miller of Whitfield & Eddy P.L.C., Mount Pleasant, and Sydnee
M. Waggoner of Whitfield & Eddy P.L.C., Des Moines, attorneys for
appellant.

Jeffrey A. Smith, Oskaloosa, attorney for appellee.

Considered without oral argument
by Tabor, C.J., and Chicchelly and Sandy, JJ.
Opinion by Sandy, J.

**SANDY, Judge.**

The record here presents a difficult and admittedly close case involving domestic abuse, conflicting testimony, and ongoing parental conflict. But our task is not to reweigh isolated pieces of evidence—it is to determine on the entire record whether the district court reached a result consistent with the child's best interests, while giving appropriate deference to credibility findings. We find it did so and accordingly affirm.

## BACKGROUND FACTS AND PROCEEDINGS

Auston Herman and Holly Morrison are the parents of L.P.H., born in 2020. The parties never married. Auston resides in Keokuk County, Iowa, where he farms and lives with his partner and her children. Holly resides in Comfrey, Minnesota, with her partner in a blended household that includes children from prior relationships.

The parties' relationship began in approximately 2019 and was marked by periods of separation and reconciliation. Auston was not consistently involved in L.P.H.'s life during the child's early years but became more involved at the beginning of 2022 after the parties resumed their relationship and cohabited.

The record reflects a history of conflict during the parties' relationship, including domestic abuse. Evidence presented at trial included testimony describing physical altercations between the parties, law enforcement involvement, and related criminal proceedings. One such incident resulted in Auston receiving a deferred judgment following a burglary-related offense arising from a dispute between the parties. The district court, however, found the parties' accounts of these events to be

conflicting and determined that neither party's testimony was credible in all respects.

In March 2023, L.P.H. was removed from the parties' care through a child-in-need-of-assistance (CINA) proceeding following concerns related to the parties' relationship and home environment. During that case, the child was placed with the paternal grandparents, who provided daily care and supervised visitation. Both parents progressed from supervised to unsupervised visitation over time.

The child was returned to Holly's care in November 2023. By the time the CINA case closed in August 2024, Auston was exercising regular unsupervised visitation, including multi-day parenting periods extending from Monday mornings through Wednesday evenings. No safety concerns were identified at that time relating to Auston's care of the child. In addition, the record reflects that Auston had made significant progress in anger management therapy. Workers noted concerns that without a bridge order in place at the close of the CINA, Holly would alienate L.P.H from his father and Auston would have very little contact with him.

Shortly after the CINA case closed, Auston filed a petition for custody. That same day, the district court entered an order prohibiting removal of L.P.H. from the state of Iowa without the consent of both parties or court approval. Despite that order, Holly relocated to Minnesota with the child. The record reflects that she did so without securing permission from the court and that not all her other children relocated with her.

A temporary hearing was held in November. The district court awarded Auston temporary physical care of L.P.H. and granted Holly visitation. After the temporary order, Auston filed a petition for writ of

habeas corpus when Holly did not return the child as required. The district court ordered the child's return on December 13 and denied Holly's motion to reconsider the temporary custody ruling. There were other ongoing disputes concerning Holly's compliance with court orders and her stated intention to limit or deny Auston's contact with the child.

The matter proceeded to trial on July 17, 2025. The evidence at trial addressed the parties' respective parenting abilities, living environments, and willingness to facilitate the child's relationship with the other parent. Evidence showed that Auston maintained stable housing on a multi-acre farm, had consistent employment, and exercised regular parenting time with another child. Testimony also reflected that L.P.H. had developed bonds with Auston, his partner, and other children in that household. With respect to Holly, the evidence showed she had prior employment as a licensed nurse but was not working outside the home at the time of trial. She testified to providing care within her household and assisting with farming activities. L.P.H. has a bond with Holly and his siblings, and Holly has been a primary caregiver for significant portions of the child's life.

The district court also considered the parties' ability to communicate and co-parent. It found the parties have a significant inability to communicate effectively and that Holly has acted in ways that interfered with Auston's relationship with the child, including retaining the child in Minnesota contrary to court orders. The court also found Auston was more likely to support the child's relationship with the other parent.

Within a week of trial, the district court entered a decree awarding the parties joint legal custody and placing L.P.H. in Auston's primary physical care. The court determined that joint physical care was not feasible given the parties' geographic distance, communication difficulties, and ongoing

4

conflict. Holly filed a timely notice of appeal challenging both the award of primary physical care and the decision to grant joint legal custody.

## STANDARD OF REVIEW

Custody determinations are reviewed de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016); *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). Still, "[w]e give weight to the findings of the district court, particularly concerning the credibility of witnesses." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We only disturb the district court's ruling when the ruling fails to do equity. *In re Marriage of Towne*, 966 N.W.2d 668, 674 (Iowa Ct. App. 2021); *Hensch*, 902 N.W.2d at 824.

## DISCUSSION

### I. Legal Custody

In child-custody cases where the parents have never been married, we still look to the factors in Iowa Code section 598.41 to determine custody and physical care arrangements. Iowa Code § 600B.40(2) (2025); *see also Hensch*, 902 N.W.2d at 825. Section 598.41(2)(b) requires the court to consider granting joint custody even when the parties do not agree to joint custody and sets out factors which courts must consider before determining that joint custody is unreasonable and not in the best interest of the child. "The legislature and judiciary of this State have adopted a strong policy in favor of joint custody from which courts should deviate only under the most compelling circumstances." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992); *see* Iowa Code § 598.41(2)(a). "To deny joint custody requires a finding by clear and convincing evidence that joint custody is not reasonable and not in the best interest of the child to the extent the legal

5

custodial relationship between the child and a parent should be severed." *In re Marriage of Holcomb*, 471 N.W.2d 76, 79–80 (Iowa Ct. App. 1991).

Holly argues joint legal custody is not appropriate given the parties' history of domestic conflict and their demonstrated inability to communicate effectively. She contends the record—particularly the evidence of physical altercations and ongoing hostility—shows the parties cannot cooperate in making decisions affecting the child's welfare. In her view, this level of discord renders joint decision-making unworkable and contrary to the child's best interests.

Although the parties have had significant communication difficulties, joint legal custody may remain appropriate where both parents are capable of participating in major decisions affecting the child. *Harris*, 877 N.W.2d at 441. Such is the case here. And as for Holly's domestic-abuse claims, for the reasons further articulated below, the district court's decision to award joint legal custody while placing physical care with Auston reflects a balanced approach. It preserves both parents' involvement while ensuring stability in the child's daily life. We agree that joint legal custody is appropriate.

## II.    Physical Care

"The objective of a physical care determination is to place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007); *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). Iowa Code section 598.41 sets forth a series of nonexclusive factors that are relevant in physical care determinations. *See Hansen*, 733 N.W.2d at 696. And our case law sets forth similar additional factors. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing a series of "principles applicable to . . . custody issue[s]"). Our overriding consideration "is the best interests

of the child." Iowa R. App. P. 6.904(3)(n). In determining those interests, we consider the parties' respective abilities to minister to the child's needs, the stability of each home, and—critically—the likelihood each parent will support the child's relationship with the other parent. *Harris*, 877 N.W.2d at 442; *see Randall v. Trier*, 15 N.W.3d 809, 813–15 (Iowa Ct. App. 2024).

## A.    Domestic Abuse.

We begin with the most serious issue raised on appeal: evidence of domestic abuse.[1] Indeed, "[d]omestic abuse is, in every respect, dramatically opposed to a child's best interests." *In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997).

As to the domestic abuse, the district court found:

> Auston and Holly lived together from approximately July 2022 to August 2023. In September 2023 Auston was charged with Burglary in the First Degree and Domestic Abuse Assault, First Offense, with Dangerous Weapon. A no contact order was entered between Auston and Holly in the criminal case. Auston received a deferred judgment on June 16, 2025, to the offense of Burglary in the Third Degree, and a five-year sentencing no contact order was entered pursuant to Iowa Code § 664A.5. The no contact order does not specifically list L.P.H. as an "Other Protected Persons" nor

---

[1] Iowa Code section 598.41 is informative on this issue. Paragraph (1)(b) provides that "if the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists," and paragraph (2)(c) further establishes that a domestic abuse finding "which is not rebutted, shall outweigh consideration of any other [best-interests] factor." Iowa Code § 598.41(1)(b), (2)(c). Some contend that this code section does not apply to physical care determinations—only legal custody. Yet domestic-violence issues remain relevant to both legal custody and physical care when considering the best interests of the child. But section 598.41's applicability to those considerations is a question we leave for another day. In any event, section 598.41 is a useful reference for emphasizing our legislature's belief that domestic abuse profoundly threatens the child's safety and development. And we do look to section 598.41 in physical care cases when deciding the child's best interests. *See Hansen*, 733 N.W.2d at 696.

was L.P.H. listed as a victim in the criminal case. The no contact order does not state that Auston is prohibited from pursuing custody or visitation with L.P.H. The Court heard the conflicting testimony of the parties regarding the reports and denials of domestic abuse during Auston and Holly's relationship, including the September 2023 incident which led to Auston's deferred judgment. The Court does not find Holly to credibly report all situations but also does not completely believe each of Auston's denials. Holly appears manipulative in some of her reports. What is believable is that these two people cannot effectively communicate and that Auston has successfully completed therapy, including [Iowa Domestic Abuse Program], and that when the CINA case closed in August 2024, there were no concerns as to L.P.H.'s safety or well-being when in Auston's care. The Court also believes that Holly has not fully addressed her mental health issues and that she does not seriously consider that L.P.H. may need some therapy to address all that he has experienced in his short lifetime. Holly testified that she does not want Auston to have contact with L.P.H., and she has acted in a way that prevented any contact since her move in August 2024. This is despite an order in this case which granted Auston temporary physical custody. The Court finds Holly not credible in her explanation or justification in refusing to follow the court's orders herein. She knew she was not awarded temporary physical custody; she refuses to follow the order. Holly intends to continue to deny Auston and L.P.H. meaningful contact. L.P.H. will suffer emotionally and psychologically as a result.

The record here contains significant and concerning domestic-abuse evidence. Photographs admitted at trial depict visible bruising to Holly's face, neck, and body. The record also reflects multiple reported incidents of physical conflict between the parties, including the incident that resulted in criminal charges and a subsequent guilty plea by Auston to a reduced offense. Additional evidence includes third-party observations of injuries and statements describing volatile interactions within the home. This evidence is serious and directly relevant to the best-interests analysis. *Hansen*, 733 N.W.2d at 698 (noting evidence of domestic abuse is an important consideration in custody determinations and may weigh heavily against certain custodial arrangements).

But the inquiry does not end there. The district court was required to weigh that evidence against the entire record, including conflicting testimony, corroboration, and the parties' credibility. Here, the district court expressly found the parties' accounts of domestic abuse to be conflicting, found Holly not credible in all respects, and declined to fully credit her characterization of events. At the same time, it concluded that while conflict occurred, Auston had addressed his deficiencies and that the child was safe in his care. We give weight to those credibility determinations. *Harris*, 877 N.W.2d at 440; *Hansen*, 733 N.W.2d at 690.

### B. Stability, Continuity, and Caregiving.

Stability and continuity of caregiving are central to the best-interests analysis. *Hansen*, 733 N.W.2d at 696–97. The goal is to place the child in the environment most likely to promote healthy physical, emotional, and social development. *Id.* at 696; *McKee*, 785 N.W.2d at 737.

The district court found Auston maintains stable housing and employment, provides a structured environment, and has fostered positive relationships between the child and other members of his household. It also found that L.P.H. does not exhibit the same behavioral concerns during Auston's parenting time as during Holly's time. By contrast, while Holly is a capable parent, the record reflects greater instability in her circumstances. She relocated to Minnesota shortly before the custody proceedings, was not employed outside the home at the time of trial despite prior employment as a nurse, and described a household arrangement that was, at times, fluid and uncertain.

Holly advances that because she was the primary caregiver early in the child's life, the rule of approximation favors physical care be placed with her.

Both parents are capable and have meaningful relationships with L.P.H. True, Holly served as a primary caregiver for portions of the child's life and shares a strong bond with him. But the record also demonstrates that, particularly following the CINA proceedings, Auston exercised consistent, unsupervised parenting time and developed a stable caregiving routine. We think this factor is largely inconclusive given that history. And while stability is important, "our case law places greater importance on the stability of the relationship between the child and the primary caregiver over the physical setting of the child." *In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998); *see also McKee*, 785 N.W.2d at 738–39. On this point, the district court found both parties capable parents with robust social support, and we tend to agree on our de novo review.

Make no mistake, past caregiving is an important factor. But it is not dispositive. *Hansen*, 733 N.W.2d at 697; *McKee*, 785 N.W.2d at 739. The court must determine which parent is best positioned to provide stability going forward. On this record, the district court concluded that parent was Auston. The evidence supports that determination.

### C.    Communication and Conflict.

The parties' ability to communicate and cooperate is another critical consideration. *Hansen*, 733 N.W.2d at 698–99; *Hensch*, 902 N.W.2d at 825–26. High levels of conflict can undermine a child's well-being and weigh against custodial arrangements requiring ongoing coordination. *See Hansen*, 733 N.W.2d at 698–99. Here, the record reflects a high-conflict relationship marked by accusations, litigation, and an inability to effectively communicate. The district court specifically found the parties cannot communicate in a productive manner. That finding weighs against joint physical care—notwithstanding the geographic complications—but it also underscores the

importance of placing physical care with the parent most likely to minimize the effects of conflict on the child.

### D. Support for Other Parent-Child Relationship.

Considering the foregoing factors, we believe this was perhaps the most significant factor at play. A parent's willingness to support the child's relationship with the other parent is a central consideration. *Harris*, 877 N.W.2d at 440–41. Holly removed L.P.H. from Iowa in violation of a court order and retained the child in Minnesota despite a subsequent order requiring his return. Even after the district court awarded Auston temporary physical care, Holly did not comply and continued to restrict contact. The district court found this conduct was intentional, found Holly's explanations not credible, and determined she intended to deny Auston meaningful contact with the child. Conversely, the district court found Auston more likely to support the child's relationship with Holly. This factor weighs heavily in the analysis. *See id.* Custodial arrangements should promote, not hinder, the child's relationship with both parents. *Hansen*, 733 N.W.2d at 700. On this record, the district court reasonably concluded that placement with Auston better serves that objective.

## III. Attorney Fees

Both parties request appellate attorney fees. "An award of attorney fees on appeal is not a matter of right, but rests within [the court's] discretion." *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007); *see Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). But in chapter 600B proceedings, "the court may award the prevailing party reasonable attorney fees," so we cannot award Holly attorney fees. Iowa Code § 600B.26.

In awarding attorney fees, we consider the financial needs of the requesting party, the ability of the other party to pay, and whether the requesting party had to defend the trial court's decision on appeal. *McDermott*, 827 N.W.2d at 687. Considering all those factors, we also decline to award Auston appellate attorney fees.

**AFFIRMED.**